IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FORT SMITH DIVISION

CURTIS and CRISTI PINSON, Individually and as
Husband and Wife                                                    PLAINTIFFS

v.                              Case No. 2:12-CV-02160

45 DEVELOPMENT, LLC; CITI TRENDS, INC.;
CITI TRENDS, INC. d/b/a CITITRENDS; and
BRANDRITE SIGN COMPANY, INC.                            DEFENDANTS

## <u>MEMORANDUM OPINION AND ORDER</u>

Currently before the Court are the following pending motions for summary judgment or
partial summary judgment, all of which are ripe for decision:

- Defendant Citi Trends, Inc.'s ("Citi Trends")[1] motion for summary judgment (Doc.
  196), brief in support (Doc. 197), and exhibits; and Plaintiffs Curtis and Cristi
  Pinson's response in opposition (Doc. 244);

- Defendant Brandrite Sign Company, Inc.'s ("Brandrite") motion for summary
  judgment on Citi Trends' third-party complaint (Doc. 211), brief in support (Doc.
  212), and exhibits;

- Plaintiffs' cross-motion for partial summary judgment against Citi Trends (Doc.
  214);

- Defendant 45 Development, LLC's ("45 Development") motion for summary
  judgment (Doc. 220), brief in support (Doc. 221), and exhibits; Plaintiffs' response
  in opposition (Doc. 241); Brandrite's brief concerning certain facts alleged in 45

---

[1] Defendants Citi Trends, Inc. and Citi Trends, Inc. d/b/a/ CitiTrends appear to be the same
entity and thus will be referred to collectively as "Citi Trends."

-1-

Development's motion (Doc. 243); and 45 Development's reply (Doc. 251);

- Brandrite's motion for summary judgment on Plaintiffs' amended complaint and on 45 Development's cross-claim (Doc. 225), brief in support (Doc. 226), and exhibits; Plaintiffs' response in opposition (Doc. 253); and Brandrite's reply (Doc. 258); and

- Plaintiffs' amended motion for partial summary judgment (Doc. 238), brief in support (Doc. 239), and exhibits; 45 Development's response in opposition (Doc. 249); Citi Trends' response in opposition (Doc. 254); and Brandrite's response in opposition (Doc. 256).

The Court observes that resolving these cross-motions for full or partial summary judgment potentially disposes of all claims pending in the case. Therefore, the Court will begin its analysis by considering whether judgment should enter as a matter of law as to any Plaintiffs' claims against the three Defendants: 45 Development, Citi Trends, and Brandrite.

Once the Court has addressed the summary judgment motions listed above, the Court will turn its attention to the following motions:

- Plaintiffs' motion to dismiss party without prejudice (Doc. 174);

- Plaintiffs' first motion for declaratory judgment (Doc. 190) and Defendants 45 Development and Brandrite's joint response in opposition (Doc. 245);

- Plaintiffs' second motion for declaratory judgment (Doc. 194) and Defendants 45 Development and Brandrite's joint response in opposition (Doc. 246); and

- Plaintiffs' motion for leave to supplement first motion for declaratory judgment (Doc. 260).

## I.     Background

-2-

Plaintiff Curtis Pinson was severely injured when he was installing an electric store-front sign on the exterior of a building owned by Defendant 45 Development and leased by Defendant Citi Trends, a clothing retailer. How Mr. Pinson was injured is not materially in dispute.

At the time of the accident, Mr. Pinson, an employee of non-party Anchor Sign Company ("Anchor"), was a licensed master sign electrician with ten years of experience in the field. He arrived at the Citi Trends store site in Fort Smith, Arkansas, on February 21, 2011, along with two other Anchor employees named Derrick Stewart and Sean Brown. Mr. Pinson was the crew leader in charge of the installation.

Upon Mr. Pinson and his crew's arrival at the Citi Trends store, Mr. Pinson determined that the building's electrical panel, which he needed to access in order to connect the sign to a power source, was located inside an overhead rain canopy that jutted out above the store's front doors. Mr. Pinson examined the underside of the canopy and discovered immediately that there was no pre-cut access panel or crawl space he could use to enter it from ground level. Faced with the dilemma of how to enter the canopy and access the electrical panel, Mr. Pinson then looked for an on-site general contractor or representative from either Citi Trends or 45 Development to advise or assist him. As there was no one available on the premises at the time, Mr. Pinson decided to solve the "access problem" himself.

He climbed onto the roof of the building to see if there was a way he could lower himself into the canopy from above. Once Mr. Pinson was standing on the roof, he was able to see into the canopy and observe its layout and the composition of its flooring. Mr. Pinson testified in his deposition that it was obvious to him before he entered the canopy that the "floor" of the canopy was not a true floor that was meant to bear weight. Rather, it was made of a metallic, translucent

substance that was obviously insubstantial.  Mr. Pinson observed that this "floor" was reinforced with thin crossbeams, or girders, made presumably of steel or some other metal, which cris-crossed the "floor" at certain intervals.  Each metal crossbeam was less than two inches wide, according to Mr. Pinson.  Because Mr. Pinson knew that his 12-foot stepladder would likely break through the thin "floor" if he placed the ladder directly on it, he decided instead to place a plank of wood he found in his truck across one or more of the two-inch metal crossbeams to create a wider surface on which to place the ladder, and then balance the "feet" of the ladder on the plank of wood.

With the ladder now balanced on the plank of wood, and the wood balanced on the two-inch crossbeam, Mr. Pinson lowered himself down the ladder to the canopy floor, which was itself suspended about 15 feet above the sidewalk in front of the store.  One of Mr. Pinson's assistants, Mr. Stewart, held the ladder steady at the top as Mr. Pinson descended.  Mr. Pinson then successfully connected the Citi Trends sign to the electrical panel and began his ascent up the ladder to the roof. As he put his hand on a rung of the ladder to pull himself up, Mr. Pinson testified that he thought the ladder shifted or wobbled at the top.[2]  Mr. Pinson instinctively stepped back off the ladder onto the unstable "floor" of the canopy, which gave way under his body weight.  Mr. Pinson fell through the canopy and landed several feet below on the concrete sidewalk.

He sustained crushing injuries to his elbow, hip, and right foot as a result of his fall.  Since the accident, Mr. Pinson has undergone at least six surgeries to his right foot, and he remains permanently impaired with severe pain that makes it impossible for him to work.  He alleges in his amended complaint that there is a possibility his foot will have to be amputated.  His wife, Plaintiff

---

[2]  Mr. Stewart testified that at the time Mr. Pinson fell, Mr. Stewart was not holding the ladder.  (Doc. 252-6, p. 7).

Cristi Pinson, makes a claim for damages for loss of consortium due to Mr. Pinson's injuries.

Mr. Pinson brought his original complaint in this Court on July 19, 2012, against 45 Development, Citi Trends, and several other individuals connected with those companies. The complaint was amended several times over the next year, and the most recent amended complaint (Doc. 82) was filed on May 22, 2013, naming Citi Trends, 45 Development, and Brandrite as Defendants.[3] The amended complaint lists causes of action against all three Defendants for "absolute liability," due to the allegedly ultrahazardous condition of the area where Mr. Pinson was injured, and for common-law negligence.

Brandrite filed cross-claims against 45 Development and Citi Trends (Doc. 88) for contribution and/or indemnity pursuant to the Uniform Contribution Among Tortfeasors Act and the Civil Justice Reform Act of 2003. In its answer to the amended complaint, 45 Development also prayed for "an apportionment of the several liability of all persons, or entities, joined or not joined, or immune from tort . . . ." (Doc. 94).

Before considering the merits of Plaintiffs' claims, the Court must first analyze the relationships among the various Defendants in this case, primarily to determine what if any duties of care each may have owed to Mr. Pinson. Beginning with Defendants 45 Development and Citi Trends, the Court observes that there is no genuine, material dispute of fact that 45 Development owned the building where Mr. Pinson was injured, and Citi Trends leased the building from 45 Development. (Doc. 82-1). As part of the lease agreement between 45 Development and Citi Trends, 45 Development agreed to complete various construction projects, described in the lease as

---

[3] Brandrite was originally a third-party defendant in this case, but after the most recent amendment of the complaint, Plaintiffs added Brandrite as a first-party Defendant.

"Landlord's Work," so that the store would be better suited to Citi Trends' retailing needs prior to

Citi Trends taking possession of the store.  *See id.* at pp. 24-27.  According to the lease, Citi Trends

was not required to accept possession of the premises until 45 Development's construction projects

were completed and had been inspected "by the appropriate authority." *Id.* at p. 27.  Citi Trends also

was not to "unreasonably interfere" with any of 45 Development's construction projects. *Id.* at p.

6.

Citi Trends' responsibilities under the lease agreement were different from 45

Development's.  While 45 Development was to complete construction projects inside the store, Citi

Trends agreed to design and install its own exterior store-front sign.  *Id.*  Citi Trends originally

contracted with Brandrite, a sign company headquartered in South Carolina, for certain sign-related

"services," which were never specified in the parties' contract.  The contract between Citi Trends

and Brandrite, whose material terms are not in dispute, also states explicitly that Brandrite was "an

independent contractor" and not "an agent or employee of Citi Trends for any purpose whatsoever."

(Doc. 212-1).

Brandrite created drawings and plans for Citi Trends' store-front sign and secured a permit

for the installation of the sign.  However, Brandrite never installed the sign.  At around the time the

Fort Smith Citi Trends store was being prepared to open for business, Citi Trends was also

rebranding or remodeling 50 of its other store locations, all of which needed new store-front signs.

Brandrite, which was Citi Trends' long-standing sign installer, could not handle the volume of sign-

installation work by itself.  (Doc. 255-2).  Therefore, Citi Trends agreed that two other sign

companies would share the work with Brandrite in order to complete numerous Citi Trends sign

installations over a short time frame.  Citi Trends expressed no preference on which of the three sign

companies actually completed the sign-installation work for the Fort Smith store. (Doc. 255-1, p. 6). The three sign companies that split up Citi Trends' sign-installation work were Brandrite and non-parties Anchor and YESCO.

The director of construction for Citi Trends, Billy Graves, testified in his deposition (Doc. 212-3) and affirmed in a separate affidavit (Doc. 212-4), without contradiction from Plaintiffs, that Citi Trends had no contract with Brandrite that required Brandrite to perform the actual sign installation. The evidence is clear and Citi Trends admits that Anchor, not Brandrite, was hired to install the sign at the Fort Smith store. The uncontroverted evidence submitted by Brandrite also confirms that Citi Trends paid Anchor directly for all costs associated with the sign installation at the Fort Smith store, and Brandrite had no involvement in the installation process whatsoever. Furthermore, Mr. Graves averred that Citi Trends had no direct involvement in the entire sign installation process and asserted that "Citi Trends, Inc. neither reserved the right nor exercised any control over Brandrite's or Anchor's work on the sign design and installation." (Doc. 212-4).

Further, the undisputed facts confirm that Mr. Pinson used only his or his employer's tools and equipment when performing the installation of Citi Trends' sign, and Mr. Pinson received neither direction nor oversight from any agent or employee of any of the three Defendants on any aspect of the sign-installation process. In fact, the amended complaint states that Mr. Pinson "attempted to locate the onsite general contractor or electrician . . . the onsite supervisor or any representative of the Separate Defendants" on the day of the accident, but none of those people were present at the scene. (Doc. 82, p. 7). Moreover, Anchor's sign installation manager, Tim Wilson, testified that he had no recollection of Mr. Pinson or anyone from Mr. Pinson's crew calling him on the date of Mr. Pinson's injury. According to Mr. Wilson, Mr. Pinson never consulted with him

about the crew's inability to access the electric panel and never requested other equipment from Anchor to complete the job, such as a scissor lift or a ladder of a different length. (Doc. 252-2, p. 3). Mr. Wilson agreed that he would never instruct an employee of Anchor to disregard safety or throw safety to the wind just to get the job done in a hurry (Doc. 250-2, p. 7); and Mr. Wilson further testified, and Plaintiffs do not dispute, that Anchor never threatened Mr. Pinson's job if he did not complete the sign installation the same day (Doc. 252-2, p. 4).[4]

## II.    Legal Standards

In determining whether summary judgment is appropriate, the burden is on the moving party to establish both the absence of a genuine dispute of material fact and that it is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56; *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986); *Nat'l Bank of Commerce of El Dorado, Ark. v. Dow Chem. Co.*, 165 F.3d 602 (8th Cir. 1999). The same standard applies where, as here, the parties file cross-motions for summary judgment. In such a situation, it follows that when the parties agree that there exists no genuine issue as to any material fact, "summary judgment is a useful tool whereby needless trials may be avoided, and it should not be withheld in an appropriate case." *United States v. Porter*, 581 F.2d 698, 703 (8th Cir. 1978). Each motion should be reviewed in its own right, with each side, respectively, "entitled to the benefit of all inferences favorable to them which might reasonably be drawn from the record." *Wermager v. Cormorant Twp. Bd.*, 716 F.2d 1211, 1214 (8th Cir. 1983); *see also  Canada v. Union Elec. Co.*, 135 F.3d 1211, 1212-13 (8th Cir. 1998). In order for there to be a genuine issue of material fact, the non-moving party must produce evidence "such that a

---

[4] In fact, Mr. Wilson testified that Mr. Pinson had already turned in his resignation to Anchor before the accident occurred. *See* Doc. 250-2, p. 9.

reasonable jury could return a verdict for the nonmoving party." *Allison v. Flexway Trucking, Inc.*, 28 F.3d 64, 66 (8th Cir. 1994) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

Since this is a personal injury case that turns on whether each of the Defendants owed a duty of care to Mr. Pinson at the time he was injured, "[t]he issue of whether a duty [of care] exists is always a question of law, not to be decided by a trier of fact.  If no duty of care is owed, summary judgment is appropriate." *Crenshaw v. Ark. Warehouse, Inc.*, 2010 Ark. App. 612, *2 (Ark. Ct. App. 2010) (citation omitted).

## III.    Discussion

### A.      "Absolute Liability" Claim Against All Defendants

Plaintiffs advance a cause of action against all three Defendants pursuant to Arkansas law for "absolute liability," due to the absence of code-compliant access to the exterior electrical panel on the Citi Trends building.  Plaintiffs characterize the absence of an access panel as an "ultrahazardous" condition for which liability should attach without the need for a showing of negligence.  According to the doctrine of absolute liability, the mere existence of an ultrahazardous condition is sufficient to justify a finding of liability as to the entity responsible for the condition. *Chapman Chem. Co. v. Taylor*, 215 Ark. 630, 642-43 (1949).

The kind of activity engaged in by Mr. Pinson at the time he was injured was not "ultrahazardous," as Arkansas law defines that term, nor was any condition of the premises "ultrahazardous" such that absolute liability would be warranted.  The kinds of cases in which Arkansas courts have assessed absolute liability involve the risk of serious harm to persons or property, which cannot be eliminated by exercise of utmost care.  *See* Ark. Model Jury Instruction 1108 (2012); Restatement (First) of Torts § 519 (1938).  The rare cases in which the Arkansas

Supreme Court has found evidence of ultrahazardous activity have involved flammable liquids, *e.g.,* *Zero Wholesale Gas Co., Inc. v. Stroud*, 264 Ark. 27 (1978); or dangerous chemicals, *e.g., Chapman*, 215 Ark. 630.

Further, § 523 of the Restatement of Torts provides that absolute liability for ultrahazardous activity is not available "where the person harmed . . . has reason to know of the risk which makes the activity ultrahazardous and (a) takes part in it, or (b) brings himself within the area which will be endangered by its miscarriage . . . ."  Restatement (First) of Torts § 523.  This is exactly the situation in the case at bar: even if accessing the Citi Trends' store's electrical panel were considered an inherently ultrahazardous activity—and the Court finds that it was not—Mr. Pinson's knowledge of the risks and deliberate act of placing himself in the canopy in the manner that he did eliminates the possibility of him recovering in strict liability.  This claim, therefore, is dismissed with prejudice.

### B.     Violations of Federal and State Regulations

Plaintiffs cite in their amended complaint Defendants' alleged lack of compliance with safety standards of the Occupational Safety and Health Act ("OSH Act"), the National Electrical Safety Codes ("NESC") of 2007 and 2008, and the International Builders Code ("IBC") of 2009, all of which allegedly pertain to the lack of access panel and/or the condition of the canopy "floor" as a work site.  First, Defendants assert that no state or federal agency issued citations for violations of the OSH Act, the NESC, or the IBC with respect to the Citi Trends store where Mr. Pinson was injured.  Plaintiffs present no contrary proof; therefore, the Court will assume as true that no citations were issued.  Second, there is no private right of action for violations of the OSH Act or any of the Codes cited by Plaintiffs.  Although violations of the OSH Act may be evidence of negligence, the Act's language specifies that it cannot be used to expand a party's common law duties.  *Solis v.*

*Summit Contractors, Inc.*, 558 F.3d 815, 829 (8th Cir. 2009) (holding that the OSH Act "does not create a private cause of action and prevents federal preemption of state tort law and worker's compensation schemes").

In apparent recognition of the law as stated above, Plaintiffs request that the Court allow evidence of Defendants' lack of compliance with the OSH Act, the NESC, and the IBC to be presented to the jury as proof of negligence. Plaintiffs' briefing to the Court on this issue states: "[r]ather than contend that OSHA expands common law duties, plaintiff [sic] simply wants to instruct the jury that OSHA safety violations establish a standard of care and violations of these standards are evidence of negligence." (Doc. 241, p. 9).

The Court agrees that if any of Plaintiffs' claims for negligence were cognizable, evidence that Defendants violated the OSH Act or any other State regulation could potentially be presented to the jury as proof of liability. But this case is not currently before the jury; it is before the Court on summary judgment. The OSH Act cannot be construed "to enlarge or diminish or affect in any other manner the common law or statutory rights, duties, or liabilities of employers and employees under any law with respect to injuries, diseases, or death of employees arising out of, or in the course of, employment." 29 U.S.C. § 653(b)(4). Very plainly this means that as the Court preliminarily assesses whether any duties of care were owed to Mr. Pinson under the common law, any alleged violations of the OSH Act cannot be considered in the analysis, as doing so would serve to enlarge, diminish, or affect these duties of care. The Court therefore declines to consider at this time whether any violations of these regulations did, in fact, occur, since they would not be actionable in and of themselves and would only be relevant if a duty of care were owed.

### C.    Negligence Claim Against Brandrite

As stated above, Citi Trends' third-party complaint against Brandrite was rendered moot when Plaintiffs amended their complaint to add Brandrite as a first-party Defendant.  Citi Trends never renewed its claims against Brandrite in the form of a cross-claim.  However, 45 Development filed a cross-claim against Brandrite for contribution and/or indemnity, and Brandrite filed cross-claims against 45 Development and Citi Trends on the same basis.  All cross-claims are therefore claims that are dependent on Plaintiffs' ability to recover against any of the Defendants.  With that in mind, the Court will address each Defendant's potential liability in turn, beginning with Brandrite.

Plaintiffs bring a claim against Brandrite for negligence.  Under Arkansas law, in order to prevail on a claim for negligence, a plaintiff must prove the following: (1) that the defendant owed a duty to the plaintiff; (2) that the defendant breached that duty; and (3) that the breach was the proximate cause of the plaintiff's injuries.  *Branscumb v. Freeman*, 360 Ark. 171, 179 (2004).

Here, Plaintiffs' claims against Brandrite fail at the outset, as Brandrite had no relationship with Citi Trends, Anchor, or Mr. Pinson that would create a duty of care.  The evidence demonstrates that Brandrite was under no legal obligation to install Citi Trends' sign and was not in an employer/employee or contractor/sub-contractor relationship with Anchor.  Instead, Anchor dealt directly with Citi Trends and was paid by Citi Trends for all aspects of manufacturing and installing the store-front sign, with the sole exception of Brandrite securing the sign-installation permit from the City of Fort Smith.  (Doc. 226-3, pp. 9-13; Doc. 226-7, pp. 9-33).

Furthermore, while Brandrite provided Anchor with Citi Trends' approved sign design, there is no evidence that Brandrite offered Anchor/Mr. Pinson any suggestions, direction, or advice on how to manufacture or install Citi Trends' sign.  Instead, the uncontroverted facts demonstrate that Brandrite exerted no control over Anchor/Mr. Pinson's work.  Brandrite performed no sign-

installation survey of the premises, sent no employees to the Citi Trends store on the date Mr. Pinson was injured, and did not direct Mr. Pinson to arrive at the Fort Smith store at a particular time or to install the sign according to particular methods.

Plaintiffs have few substantive arguments to make in opposition to Brandrite's motion for summary judgment. It appears Plaintiffs' only theory of liability is that Brandrite may be "guilty by association" with Citi Trends because of an alleged agent/principal relationship between Brandrite and Citi Trends. "Although the nature of an agency relationship is ordinarily a question of fact to be determined by the trier of fact, where the facts are undisputed and only one reasonable inference can be drawn from them, the nature of an agency relationship becomes a matter of law for the court to determine." *Draper v. ConAgra Foods, Inc.*, 92 Ark. App. 220, 229 (Ark. Ct. App. 2005).

After examining the facts submitted by the parties, the Court finds no evidence to support Plaintiffs' agency theory. As the written contract between Citi Trends and Brandrite clearly shows, Citi Trends and Brandrite's relationship was that of independent contractor and employer—not employee and employer or agent and principal. *See* Doc. 256-2 ("Citi Trends and Contractor [Brandrite] acknowledge and agree that Contractor [Brandrite]is an independent contractor and that this Agreement does not constitute or appoint Contractor as an agent or employee of Citi Trends for any purpose whatsoever.").

To the extent Plaintiffs contend that Citi Trends had the right to control Brandrite, contrary to the terms of the written contract, Plaintiffs have offered no evidence of such control, other than the fact that Citi Trends retained the right to approve of Brandrite's sign designs and to designate where and when the sign should be installed. The Arkansas Supreme Court has held that an employer's right to inspect and approve of an independent contractor's work is not evidence of the

employer's ability to control the independent contractor.  *See Jackson v. Petit Jean Elec. Co-op*, 270 Ark. 506, 508 (1980) (finding that employer's right to alter size of independent contractor's work force, inspect quality and type of tools and equipment used, and approve of final work product did not constitute "supervision or control over the manner and actual details of the work").

As Arkansas courts acknowledge that the hallmark of a principal/agent relationship is control, an agent must have the authority to act for a principal, and the agent must be subject to the principal's control.  *Pledger v. Troll Book Clubs, Inc.*, 316 Ark. 195, 200 (1994).  All evidence presently before the Court confirms that Brandrite worked independently, without direction or control by Citi Trends, to plan and execute proposed designs for Citi Trends' sign and to find another independent contractor that would agree to manufacture and install the sign when Brandrite found itself unable to complete that work.

Just as there are no facts to show that Citi Trends had control over Brandrite, there are also no facts to show that Brandrite had control over Anchor. The deposition testimony of Brandrite's representative, Lin Oberholtzer, and Citi Trends' representative, Billy Graves, shows that Brandrite was not a "middleman" brokering a sign-installation contract between Citi Trends and Anchor. Instead, Brandrite and Anchor communicated with one another and mutually agreed—without Citi Trends' input—that Anchor and Brandrite would divide up the installation work for Citi Trends, with Anchor bearing the responsibility for the manufacture and installation of the Citi Trends sign in Fort Smith, and Brandrite installing Citi Trends signs in other locations.  (Doc. 255-2, pp. 3-4). Citi Trends then dealt directly with Anchor for sign installation, and Brandrite was effectively cut out of the transaction altogether from that point onward, including on the date of Mr. Pinson's injury. To suggest that Brandrite controlled the timing, method, or manner of Anchor's sign installation is

-14-

belied by the deposition testimony of representatives of Anchor, Citi Trends, and Brandrite, and Plaintiffs have not produced their own evidence to challenge this proof with any proof of their own. *See Conseco Life Ins. Co. v. Williams*, 620 F.3d 902, 909 (8th Cir. 2010) ("'When the movant makes a prima facie showing of entitlement to a summary judgment, the respondent must discard the shielding cloak of formal allegations and meet proof with proof by showing a genuine issue as to a material fact.'") (quoting *Flentje v. First Nat'l Bank of Wynne*, 340 Ark. 563, 569 (2000)).

Viewing the facts in Plaintiffs' favor and giving Plaintiffs' allegations the benefit of the doubt, it is clear that no duty of care was owed by Brandrite to Mr. Pinson. Brandrite made no preparations, other than to secure the sign-installation permit with the City of Fort Smith, to conduct a survey of the premises for the purpose of hanging the sign or to actually hang the sign. Plaintiffs offer no evidence to counter the testimony of Brandrite and Anchor's witnesses that show that Brandrite was unaware of Anchor's plans and methods for hanging the sign. Citi Trends dealt directly with Anchor, not Brandrite, in order to have the sign installed. As Brandrite had no meaningful involvement in the transaction between Citi Trends and Anchor, and Brandrite owed no duty of care to Mr. Pinson, summary judgment is appropriate as to Brandrite, and all of Plaintiffs' claims against Brandrite are dismissed with prejudice.

### D.    Negligence Claim Against 45 Development

The parties agree that 45 Development owned the building in which Mr. Pinson was injured. According to the lease agreement between Citi Trends and 45 Development, Citi Trends was responsible for installing its own signage and was explicitly authorized by 45 Development to "act as its own general contractor and . . . choose its subcontractors." (Doc. 82-1, p. 6). In addition, the lease made it Citi Trends' exclusive responsibility to "erect and maintain on the facade of the

Premises one of Tenant's standard signs . . . ." *Id.* at p. 17.

It is clear to the Court that if Mr. Pinson were considered a business invitee of Citi Trends, he also would have been a business invitee of 45 Development. The lease agreement empowered Citi Trends to hire its own contractors to accomplish certain construction tasks, including the manufacture and placement of an exterior sign. The lease did not require Citi Trends to seek 45 Development's prior approval before scheduling Citi Trends' own "work." Therefore, even if 45 Development was unaware that Mr. Pinson was on the premises the day he was injured, 45 Development knew or should have known that Citi Trends would be hiring a contractor at some point in the near future to hang a sign, and that the contractor would be on the premises for that purpose.

Arkansas law provides that "[t]he duties of owners and occupiers of land to business invitees usually end when the danger is either known or obvious to the invitee." *Kuykendall v. Newgent*, 255 Ark. 945, 947 (1974). Considering this basic principle of Arkansas law, it would appear that 45 Development's potential liability to Mr. Pinson ended when Mr. Pinson arrived at the premises and noticed the obvious lack of a ground-level entry panel leading inside the overhead canopy, as well as the lack of a stable, weight-bearing floor within the canopy.

To the extent the absence of an access panel can even be considered a "hazard,"[5] Mr. Pinson

---

[5] In the Arkansas cases surveyed by the Court involving the tort liability of business owners, the sorts of hazards that implicate the duty of care owed to business invitees are ones that cause injury at the time they are encountered, such as a falling tree limb, *Young v. Paxton*, 316 Ark. 655 (1994), spilled diesel fuel in a truck terminal, *Carton v. Missouri Pac. R. Co.*, 303 Ark. 568 (1990), or accumulations of snow and ice in a delivery entrance, *Kuykendall*, 255 Ark. 945. By contrast, Mr. Pinson suffered no injury at the point that he "encountered" the missing access panel. He also did not suffer injury when he "encountered" the flimsy "floor" of the canopy, as he recognized the "floor" could not bear his weight before he attempted to stand on it.

-16-

admitted under oath that he was aware of the condition of the overhead canopy, and despite the open and obvious risks that entry into the canopy from above would entail, he deliberately climbed up on the roof, removed paneling from the "ceiling" of the canopy, and created his own access into an otherwise inaccessible area.  As for the lack of weight-bearing flooring, Mr. Pinson and his two assistants testified that not only were they all aware that the canopy "floor" could not and should not bear weight, but Mr. Pinson knowingly and intentionally devised a way to access the canopy, using a stepladder, a wood plank from his truck, and the thin supporting beams of the "floor," in order to avoid the open and obvious risk of standing directly on the canopy "floor."

"Proximate cause is defined, for negligence purposes, as that which, in a natural and continuous sequence, unbroken by any efficient intervening cause, produces the injury, and without which the result would not have occurred." *Watkins v. Ark. Elder Outreach of Little Rock, Inc.*, 2012 Ark. App. 301, *14 (Ark. Ct. App. 2012).   "While the question of proximate cause is usually a question for the jury, when the evidence is such that reasonable minds cannot differ, the issue becomes a question of law to be determined by the trial court." *Skinner v. R.J. Griffin*, 313 Ark. 430, 433 (1993).

The amended complaint and Mr. Pinson's own deposition testimony establish that Mr. Pinson was injured because he (1) fell off a ladder (2) after it was lowered into the canopy from the roof and (3) placed precariously on a "floor" that Mr. Pinson already knew was not intended to bear weight. In short, the absence of a ground-level access panel did not compel Mr. Pinson to do anything at all, let alone climb onto the roof and create his own access to the canopy in the manner in which he did. Reasonable minds cannot disagree that it was Mr. Pinson's ascent to the roof and actions taken inside

the canopy that proximately caused his injuries.[6]

Plaintiffs contend that an exception to the "obvious danger rule" applies here, and due to the exception, 45 Development owed a duty to either fix the dangers, presumably by installing an access panel and/or stable canopy flooring, or warn Mr. Pinson about the dangers, despite his admitted knowledge.  Plaintiffs are correct that Arkansas' highest courts have recognized a narrow exception to the "obvious danger rule" when a business invitee is "forced, as a practical matter, to encounter that danger in order to perform his or her job." *Jenkins v. Int'l Paper Co.*, 318 Ark. 663, 670 (1994). Plaintiffs maintain that Mr. Pinson's injury falls squarely within this exception to the rule.  They argue that he was forced to deal with the lack of access panel and the unstable flooring  in order to complete the work of installing the Citi Trends sign.

After considering the voluminous filings by Plaintiffs and Defendants on this issue, the Court finds that this narrow exception to the "obvious danger rule" does not apply to Plaintiffs' case to create a duty by 45 Development to do anything more than warn of unknown or hidden dangers. There is no evidence that the circumstances surrounding Mr. Pinson's injury are analogous to the cases in which the obvious danger exception was found to apply.  For example, in *Kuykendall v. Newgent*, 255 Ark. at 947, the Arkansas Supreme Court found that even though the accumulation of ice and snow in the delivery entrance of a drive-in restaurant was an open and obvious hazard, "the landowner should have anticipated that the dangerous condition would cause physical harm to

---

[6]  It bears mentioning that Mr. Pinson's boss, Tim Wilson, testified that there were many other options available to Mr. Pinson other than creating access to the canopy in the manner that he did.  Mr. Pinson could have entered the canopy from the ground level and created an access panel using his tools; he could have built sufficient flooring so as to prevent falling through the canopy's translucent flooring material; he could have contacted his boss to ask for guidance, assistance, or other tools; or he could have contacted his boss to see if someone from 45 Development and/or Citi Trends could address the lack of access.  *See* Doc. 222-6.

one required to use the entrance way notwithstanding the known or obvious danger." *Id.* at 948. The evidence in *Kuykendall* showed that ice and snow had been permitted to accumulate for 18-20 hours on a driveway that had a slight slope. The meat deliveryman who was injured when falling on the ice stated that he did not know the driveway sloped, but he was aware of the accumulated ice and snow. *Id.*

Comparing the facts and analysis in *Kuykendall* to the instant case, it could be argued that Mr. Pinson was "forced" to access the overhead canopy in some way in order to complete the installation of the sign, but Plaintiffs cannot claim that Mr. Pinson was required to access the canopy in the unsafe manner he selected, namely, by descending into the canopy from the roof using a stepladder balanced on a plank of wood, with no security measures in place in case he fell from the high elevation. The plaintiff in *Kuykendall* had no other choice than to walk on the accumulated snow and ice in the delivery driveway in order to make his delivery, and his fall and subsequent injury occurred because of his "forced" encounter with the snow and ice. Mr. Pinson, by contrast, was not "forced" to stand on a stepladder he knowingly placed on a non-weight-bearing floor, simply because he encountered the absence of a ground-level access panel.

Mr. Pinson's status as an independent contractor is also critical to the question of 45 Development's duty of care. The Arkansas Supreme Court has observed that employees of an independent contractor who are directly involved in dangerous activity "have knowledge of the risks and are insured against injury by worker's compensation." *Petit Jean*, 270 Ark. at 510. In the case at bar, Mr. Pinson was no ordinary business invitee but an independent contractor with specialized skills and training in working with electricity and in hanging signs, sometimes at high elevations. Harry Barber, Anchor's corporate representative, testified that Mr. Pinson was trained in fall

-19-

protection and prevention, and that Anchor provided Mr. Pinson with a fall-prevention harness, a "bucket truck" with a hydraulic arm that was designed to elevate up to 65 feet off the ground, and a wide variety of ladders.  (Doc. 250-6).  Mr. Pinson confirmed in his deposition that he arrived at the Citi Trends store site on the date of his injury driving Anchor's bucket truck, which was equipped with at least a 12-foot stepladder and a 20-foot extension ladder.  (Doc. 222-7).  Mr. Pinson also admitted that he never tied off or mechanically secured the ladder before he used it to climb down into the canopy.  (Doc. 250-5).  He knew the canopy floor was not "meant for walking" and "obviously, looking at it, it [did]n't look like it [was] going to bear anybody."  (Doc. 226-1, p. 3).

The danger of falling in the manner that Mr. Pinson did was not inevitable, based on the lack of access panel or the quality of the canopy "floor."  The Court holds that the "obvious danger rule" applies in this case.  45 Development owed no duty of care to Mr. Pinson other than to warn him of latent dangers and hazards that were not obvious, considering his line of work and training.  The hazards Mr. Pinson encountered on the day of his injury were open, obvious, known to him before he ascended to the roof and undertook the risk of falling, and, perhaps most importantly, integral to the work he was contracted to perform.  Accordingly, no cause of action for negligence is sustained against 45 Development, and this claim is dismissed with prejudice.

### E.    Negligence Claim Against Citi Trends

To determine whether a claim for negligence may stand against Citi Trends, the Court must first determine the duty of care Citi Trends owed to Mr. Pinson.  Citi Trends readily admits that it "contracted with Anchor, Mr. Pinson's employer, for actual installation of the sign."  (Doc. 197, p. 2).  Mr. Pinson is therefore assumed to have been on the premises with the consent of Citi Trends.  Further, the lease between 45 Development and Citi Trends provided that Citi Trends was to be

solely responsible for the design and installation of its store-front sign.  It is unclear, however, whether Citi Trends had the right to control or had actual control over the exterior of the premises where the sign was to be hung.  Citi Trends contends that it had not been handed the keys to the building by 45 Development at the time of the accident and thus was not officially "in possession" of the premises until after Mr. Pinson's injury.

Plaintiffs suggest that Citi Trends' duty of care owed to Mr. Pinson should be the same as 45 Development's, since Citi Trends was functionally entitled to possess, control, and hire contractors to access at least the area of the building where the sign was to be placed.  After careful consideration, and for purposes of summary judgment only, the Court will interpret the facts presented as to the possession and control of the area where Mr. Pinson was injured in Plaintiffs' favor.  Consequently, the Court will assume that Citi Trends had the same degree of possession and control as 45 Development over the area of the building where the sign was to be placed.

As discussed previously with respect to 45 Development, an entity that owns, or in Citi Trends' case controls, a property will owe a duty of ordinary care to a business invitee "to warn against any hidden dangers or unusually hazardous conditions."  *Culhane v. Oxford Ridge, LLC*, 2009 Ark. App. 734, *4 (Ark. Ct. App. 2009).  When those dangers are known or obvious to the employee, however, the duty of care owed by the property owner will end.  *Kuykendall*, 255 Ark. at 947.

The Court has already determined that an exception to the "obvious danger rule" is not available in Mr. Pinson's case, as Mr. Pinson was not "forced"—in the sense that Arkansas courts have interpreted that term—to encounter a known or obvious risk to perform his job.  Moreover, as touched on previously with respect to 45 Development's duty of care, it appears that Citi Trends'

duty of care depends in large part on Mr. Pinson's status as an independent contractor.

The Arkansas Supreme Court in *Jackson v. Petit Jean Electric Co-op* found that "[t]he duty of an employer of [an] independent contractor to use ordinary care or to warn of latent dangers does not contemplate a duty to warn of obvious hazards which are an integral part of the work the contractor was hired to perform."  270 Ark. at 509.  This principle of law applies equally to an independent contractor's employee. *See D.B. Griffin Warehouse, Inc. v. Sanders*, 349 Ark. 94, 105 (2002) ("[I]t is generally recognized that an employer of an independent contractor owes a common-law duty to the contractor's employees to exercise ordinary care for their safety and to warn against any hidden dangers or unusually hazardous conditions.").

The Court finds there is no genuine, material dispute of fact that Anchor was an independent contractor, and therefore so was Anchor's employee, Mr. Pinson.  There is no fixed formula for determining whether an entity is an employee or an independent contractor, but Arkansas courts have adopted several factors, taken from the Restatement (Second) of Agency § 220(2) (1958), which are used to determine the nature of the relationship.  Mr. Pinson disagrees that either he or his employer should be considered an independent contractor, but the Court finds that the facts unequivocally confirm Mr. Pinson's independent-contractor status.  It is within the Court's discretion to determine whether an entity and its employees should be considered independent contractors as a matter of law, provided that the facts surrounding the nature of the agency relationship are undisputed and only one reasonable inference can be drawn from them. *Draper*, 92 Ark. App. at 229.

The factors to consider in determining whether a worker is an independent contractor or an employee are:  (1) the extent of control which the employer may exercise over the details of the work; (2) whether or not the one employed is engaged in a distinct occupation or business; (3)

whether the work is usually done under the direction of the employer or by a specialist without supervision; (4) the skill required in the particular occupation; (5) whether the employer or the workman supplies the instrumentalities, tools, and the place of work for the person doing the work; (6) the length of time for which the person is employed; (7) the method of payment, whether by time or by the job; (8) whether or not the work is part of the regular business of the employer; (9) whether or not the parties believe they are creating the relation of master and servant; and (10) whether the principal is or is not a business. *Id.* (quoting Restatement (Second) of Agency § 220(2)).

With respect to the first factor, the facts are undisputed that the only true direction Citi Trends gave Anchor with respect to the installation of the sign was that the sign needed to be installed within a particular time frame. This is not evidence of "control" over the details of sign-installation work, as the first factor contemplates. The second and fourth factors similarly indicate independent-contractor status, as sign installation is certainly a distinct occupation requiring specialized skills. The third factor in the Restatement is also satisfied, since sign installation is routinely done without outside supervision, and in Mr. Pinson's case, he agreed that no one from Citi Trends was on site on the day he was injured to provide him with help, support, advice, or direction on how to install the sign. The fifth factor is satisfied, as Mr. Pinson testified that Anchor supplied him with his truck and tools, and Plaintiffs never cite any facts to show that Citi Trends provided material or directional assistance in any respect with regard to the sign-installation process. The sixth and seven factors are satisfied, as evidenced by the invoices issued to Citi Trends by Anchor for distinct services performed over the course of days. (Doc. 226-7, pp. 9-33). The eighth factor and tenth factors are satisfied, as Citi Trends is not in the business of installing signs, but is a clothing retailer.

Lastly, the ninth factor is satisfied because there is no evidence that either Anchor or Citi Trends believed that they were creating the relation of master and servant.  Instead, all evidence indicates that Citi Trends maintained a "hands off" approach to the sign-installation process.  For example, Billy Graves of Citi Trends testified that he "[did]n't recall anything being ever divvied out . . . [and] [did]n't really know how Anchor got this store or that store or how Brandrite did this store or that store."  (Doc. 217-2, p. 3).  Mr. Graves only knew that Brandrite collaborated with Anchor and YESCO to divide up the sign-installation work when Brandrite realized it could not handle multiple installations for Citi Trends on its own.  (Doc. 255-1, pp. 3-4).  Mr. Graves further testified that Citi Trends did not care which company performed the installation at the Fort Smith location.  *Id.* at pp. 5-6.  For the above reasons, the Court finds as a matter of law that Anchor was an independent contractor, as was its employee, Mr. Pinson.

Notwithstanding the general rule that a business invitee is owed a duty of care, Arkansas courts have further determined that when a business invitee is also an independent contractor faced with an open and obvious hazard integral to the contractor's line of work, no heightened duty of care is owed by the employer to warn or protect the independent contractor against the hazard.  The Arkansas Supreme Court first recognized this rule in the *Petit Jean* case, where an employer was absolved of liability for negligence after the employee of an independent contractor was electrocuted when working on the employer's electric transmission system.  270 Ark. at 509.  The *Petit Jean* court found that the employer had no duty to "isolate lines from the employees of an electrical contractor whose compensation and contractual obligations expressly contemplate working around energized lines."  *Id.*

A decade later, in *D.B. Griffin Warehouse, Inc. v. Sanders*, the Arkansas Supreme Court

-24-

expanded upon the reasoning in *Petit Jean* and held that a warehouse owner did not owe a duty to warn the employee of an independent contractor that there were exposed skylights present on a roof that the employee was hired to paint. 349 Ark. 94. When the employee's widow brought a lawsuit against the warehouse owner after her husband fell to his death through a skylight, the court refused to find the hiring employer liable, opining that "the skylight was an admittedly hazardous condition about which the [independent contractor's] employees were aware, and it was [the independent contractor's] responsibility . . . to provide the necessary protections for such obvious hazards." *Id.* at 108.

The Arkansas Court of Appeals more recently decided two cases that relied on the reasoning of both *Petit Jean* and *D.B. Griffin*. In *Culhane v. Oxford Ridge, LLC*, 2009 Ark. App. 734, the Court of Appeals affirmed summary judgment in an employer's favor on a claim of negligence brought by the estate of an independent contractor, Culhane, who was killed by a vehicle as he was painting a structure situated next to a busy highway. The court determined that the "obvious danger rule" applied, and the hiring employer did not owe Culhane a heightened duty of care, as it was clear that the proximity of the work to the highway traffic posed an obvious hazard, not a hidden danger. Culhane's estate argued that the court should recognize the exception to the "obvious danger rule," since as a practical manner, Culhane was required to encounter the danger of oncoming traffic while painting, even though the danger was obvious. The court held that Culhane, as an independent contractor, was aware of the traffic that posed a hazard integral to the work he was to perform, and no further warnings or preventative measures by the employer were warranted.

Finally, in *Crenshaw v. Arkansas Warehouse, Inc.*, 2010 Ark. App. 612 (Ark. Ct. App. 2010), the Court of Appeals affirmed that a warehouse owner owed no duty of care to an independent

-25-

contractor who was hired to fix a leak on the roof of the warehouse and fell through a skylight.  The evidence showed that the independent contractor was aware that there were skylights in the roof, as they were clearly visible from inside the warehouse, but from the roof, the skylights were more difficult to see because they were partially obscured by roofing tar.  The court's opinion regarding the duty of care was as follows:

> We hold that the trial court properly determined that appellee had no duty to warn the appellant roofer that the skylights were difficult to distinguish from the roof.  Even assuming that this condition constituted a defect, and that appellee should have inspected the roof and warned appellant of this condition before he climbed atop the roof, such a warning would have informed appellant of nothing that he did not know, or should have known, the moment that he mounted the roof:  the skylights, of which appellant was aware, and which were clearly visible from inside the warehouse, were difficult to see from the perspective of a person standing on the rooftop.  Given his knowledge that there were in fact skylights on the roof, the danger posed by this condition was an obvious one of which appellant should have immediately been aware after ascending the roof.  Appellant nevertheless walked a considerable distance atop the roof before stepping through a skylight and falling.

*Crenshaw*, 2010 Ark. App. at *3.

In applying the precedent of the Arkansas Supreme Court and Arkansas Court of Appeals to the instant matter, it is clear that Citi Trends fulfilled its duty of care to Mr. Pinson.  The lack of access panel or stable "floor" in the canopy of the Citi Trends building were conditions about which Mr. Pinson was aware, just as the electrified wires in the *Petit Jean* case and the open skylights in the *D.B. Griffin* case were conditions about which the independent contractors in those cases were aware.  Similarly, the lack of a ground-level entry panel and stable flooring in the canopy were hazards integral to Mr. Pinson's job of hanging the Citi Trends sign and connecting it to a power source, just as the risk of traffic near a building next to a highway was integral to the painting work that the independent contractor in *Culhane* was hired to perform.  Lastly, even if Citi Trends had

specifically warned Mr. Pinson about these conditions prior to him climbing the roof and entering the canopy, such a warning would have informed Mr. Pinson of nothing that he did not already know, just as giving a warning to the roofer in the *Crenshaw* case about the existence of skylights would not have provided him with information he did not already know.

As Citi Trends fulfilled its duty of care to Mr. Pinson, summary judgment in Citi Trends' favor is appropriate, and Plaintiffs' claims against Citi Trends are dismissed with prejudice.

F.     **Motion to Dismiss Party and Motions for Declaratory Judgment**

Now that the Court has determined that summary judgment must be granted to all Defendants, the Court DENIES Plaintiffs' motion to dismiss Plaintiff Cristi Pinson without prejudice (Doc. 174), finding instead that she should be dismissed along with her husband, Plaintiff Curtis Pinson, with prejudice on all counts.  Additionally, Plaintiffs' pending motions for declaratory judgment (Docs. 190 & 194) and motion for leave to supplement (Doc. 260) are DENIED AS MOOT in light of the Court's dismissal of Plaintiffs' amended complaint.

IV.     **Conclusion**

For the reasons stated above, IT IS HEREBY ORDERED that Defendant Citi Trends, Inc.'s motion for summary judgment (Doc. 196) is GRANTED; Plaintiffs Curtis and Cristi Pinson's cross-motion for partial summary judgment against Citi Trends (Doc. 214) is DENIED; and Plaintiffs' claims against Defendants Citi Trends, Inc. and Citi Trends, Inc. d/b/a CitiTrends are DISMISSED WITH PREJUDICE.

IT IS FURTHER ORDERED that Defendant Brandrite Sign Company, Inc.'s motion for summary judgment on Citi Trends' third-party complaint (Doc. 211) is DENIED AS MOOT, as Plaintiffs' amended complaint named Brandrite a first-party Defendant, and Citi Trends failed to

state or renew any direct claims against Brandrite following the filing of Plaintiffs' amended complaint.

IT IS FURTHER ORDERED that Defendant Brandrite's motion for summary judgment on Plaintiffs' amended complaint and on Defendant 45 Development, LLC's cross-claim (Doc. 225) is GRANTED. Plaintiffs' claims against Brandrite are DISMISSED WITH PREJUDICE. As 45 Development's cross-claim against Brandrite was contingent upon Plaintiffs' recovery against 45 Development, the cross-claim is now MOOT and DISMISSED WITH PREJUDICE. Brandrite's cross-claims against 45 Development and Citi Trends are also MOOT and DISMISSED WITH PREJUDICE for the same reason.

IT IS FURTHER ORDERED that Defendant 45 Development's motion for summary judgment (Doc. 220) is GRANTED, and Plaintiffs' claims pending against 45 Development are DISMISSED WITH PREJUDICE.

IT IS FURTHER ORDERED that Plaintiffs' amended motion for partial summary judgment (Doc. 238) is DENIED, and Plaintiffs' amended complaint is DISMISSED WITH PREJUDICE.

All other pending motions are DENIED.

Judgment will enter contemporaneously with this order.

IT IS SO ORDERED this 23rd day of September, 2013.

/s/ P. K. Holmes, III

P.K. HOLMES, III
CHIEF U.S. DISTRICT JUDGE